UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

UTICA MUTUAL INSURANCE COMPANY,

                       Plaintiff,

v.                                              6:12-CV-00194
                                                    (DNH/TWD)

INA REINSURANCE COMPANY,
N/K/A R&Q REINSURANCE COMPANY,

                       Defendant.
_____

APPEARANCES:                             OF COUNSEL:

HUNTON & WILLIAMS LLP             WALTER J. ANDREWS, ESQ.
Counsel for Plaintiff                       SYED S. AHMAD, ESQ.
1751 Pinnacle Drive                       PATRICK M. MCDERMOTT, ESQ.
Suite 1700
McLean, Virginia 22102

CHADBOURNE & PARKE LLP           JOHN F. FINNEGAN, ESQ.
Counsel for Defendant                  ROBERT A. SCHWINGER, ESQ.
1200 New Hampshire Avenue, NW    THOMAS J. HALL, ESQ.
Washington, DC 20036                  MICHAEL A. SAMALIN, ESQ.

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

## REPORT-RECOMMENDATION

      Plaintiff Utica Mutual Insurance Company ("Utica") has moved for a preliminary injunction against Defendant INA Reinsurance Company n/k/a/ R&Q Reinsurance Company ("R&Q") in this action for breach of confidentiality agreements and a confidentiality order, tortious interference with contract, and declaratory and injunctive relief.[1]  (Dkt. Nos. 1 and 8.)

---

[1] Plaintiff filed this lawsuit in the United States District Court for the Southern District of New York.  (Dkt. No. 1.)  The Honorable Alvin K. Hellerstein, United States District Court Judge, transferred the case to this Court on January 19, 2012.  (Dkt. No. 32.)

The suit arises out of R&Q's counsel Chadbourne & Parke LLP's ("Chadbourne") alleged use of confidential information obtained on behalf of R&Q for the benefit of an unrelated client of the firm – Fireman's Fund Insurance Company ("FFIC") – in connection with reinsurance litigation pending between Utica and FFIC in this Court ("FFIC litigation").  (Dkt. No. 10 at 8.)   Utica has moved for a preliminary injunction enjoining R&Q "from disclosing all information subject to the Confidentiality Order entered into in the pending arbitration between Utica and R&Q or subject to the confidentiality agreements between Utica and R&Q."  (Dkt. No. 8 at 1.)

The motion for a preliminary injunction was initially referred to Magistrate Judge George H. Lowe for Report and Recommendation by the Honorable David N. Hurd, District Court Judge, pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c).  Upon Magistrate Judge Lowe's retirement on February 9, 2012, the motion was reassigned to me.  (Dkt. No. 43.)

For the reasons set forth below, I recommend that Plaintiff's motion for a preliminary injunction be **DENIED**.

I.      BACKGROUND

   A.     The Parties' Confidentiality Agreements and the Arbitration Panel Order

R&Q entered into contracts with Utica obligating the reinsurer to provide Utica with reinsurance with respect to insurance policies that Utica had issued to Goulds Pumps, Inc. ("Goulds").  (Dkt. No. 1 at ¶ 1.)  In October of 2008, the parties entered into a confidentiality agreement in connection with R&Q's audit of Utica's reinsurance claims involving the Goulds policies.  *Id.* at ¶¶ 24-25; (Dkt. No. 1-1).  The agreement provided that "Reinsurer and Resolute shall hold in trust and confidence, and not disclose to any person outside of its organization any Confidential Information which is disclosed to them, which Resolute accesses, or which

2

Reinsurer is exposed to pursuant to this Audit." (Dkt. No. 1-1 at ¶ 1.)

"Confidential Information" was defined in the agreement as "certain non-public information or documents pertaining to the business of Utica which are confidential in nature and constitute proprietary, confidential or trade secret information, involving the policies issued to Goulds Pumps, Inc. by Utica and reinsured by reinsurer, claims against those policies as well as the settlement of the coverage action between Utica and Goulds Pumps, Inc." *Id*. at 2. Under the agreement, R&Q was obligated to "take all reasonable steps to ensure that the Confidential Information [was] not used, disclosed or distributed by its employees or agents in violation of the terms of the Confidentiality Agreement." *Id*. at ¶ 1. R&Q acknowledged in the October 2008 Confidentiality Agreement that a breach of its obligations under the agreement "could result in irreparable harm to Utica," and that Utica would be entitled "to seek immediate injunctive relief, in addition to any other remedies that it may have." (Dkt. No. 1-1 at ¶ 3.)

Utica commenced arbitration against R&Q in November of 2008 when the parties could not reach an agreement on Utica's reinsurance claims. (Dkt. No. 1 at ¶ 19.) In May of 2009, before the arbitration proceedings had commenced, the parties entered into an agreement entitled "Arbitration Protocol," which contained the following confidentiality provision:

> The arbitration proceeding is private and confidential, and nothing concerning the proceeding shall be disclosed publicly other than the existence of the proceeding or as may be required by law. The parties will negotiate a confidentiality agreement, which, if thereafter entered by the panel as an order, will supersede this provision. In order to preserve the arbitration's confidentiality, any court filings seeking to confirm, vacate or modify a panel ruling or final award should be made under seal to the extent permitted by law.

*Id*. at ¶¶ 26-27; (Dkt. No. 9-1 at ¶ C.)

3

A Confidentiality Agreement was executed in October of 2009 and thereafter entered as an Order in the arbitration. (Dkt. Nos. 1 at ¶¶ 28-29 and 9-2 and 9-3.) The Confidentiality Agreement and Order provide:

> Except as provided in Paragraph 3 below [identifying permissible disclosures], and absent written agreement between the parties to the contrary, Utica Mutual and R&Q agree that all briefs, depositions and hearing transcripts generated in the course of this arbitration, documents created for the arbitration or produced in the proceedings by the opposing party or third-parties, final award and any interim decisions, correspondence, oral discussions and information exchanged in connection with the proceedings (hereinafter collectively referred to as "Arbitration Information") will be kept confidential. This Confidentiality Agreement will remain in effect even after the conclusion of the arbitration proceedings.

(Dkt. No. 9-2 at ¶ 2.) The parties recognized that serious injury could result to a party and its business if the other party were to breach the agreement and agreed that "... all parties will be entitled to seek a restraining order, injunction or other equitable relief if another party breaches its obligations under this Agreement, in addition to any other remedies and damages that would be available at law or equity." *Id.* at ¶ 6.

### C.    R&Q's Alleged Breach of the Confidentiality Agreements and Order

On June 22, 2009, Chadbourne attorney Philip Goodman ("Goodman") sent Utica's counsel, Walter Andrews ("Andrews") and Syed Ahmad ("Ahmad"), an email in connection with the reinsurance dispute between Utica and R&Q. (Dkt. No. 25, Exh. 9) Although the reinsurance arbitration between Utica and R&Q was identified as the subject of the email, the content of the email reveals that it concerned R&Q's claim that Utica's disclosure in the audit

4

that R&Q had conducted in October 2008 had been incomplete. (Dkt. No. 25, Exh. 9.)[2] Goodman identified the categories of documents that had not been produced and indicated that R&Q intended to seek access to those documents in the arbitration.[3] *Id.*

Andrews responded to Goodman's email by letter of August 6, 2009. *Id.*, Exh. 10. The subject matter of the letter was identified as "Goulds Pumps Reinsurance Billings." *Id*. Andrews disputed Goodman's claim that Utica's document production in the audit had been incomplete and asserted that Goodman's June 22nd email was the first time that R&Q had made such a claim. *Id.* Andrews nonetheless acknowledged that Utica could provide the additional material requested in the Goodman email and enclosed with the letter a CD containing copies of emails sent and received by Utica Mutual Assistant Vice President, Associate General Counsel & Claims Attorney, Bernard J. Turi ("Turi"), in connection with the asbestos claims, the coverage litigation, and the settlement agreement with Goulds ("Turi CD"). *Id.;* (Dkt. No. 25-1 at 2.)

In his letter, Andrews did not specifically indicate whether the disclosure of documents with the August 6, 2009 letter was made in the context of the audit or the arbitration. It is nonetheless apparent from the letter that it was sent in response to R&Q's claim that Utica's production of documents for the audit had been inadequate.

Upon receipt of the Turi CD, Chadbourne attorney, John F. Finnegan ("Finnegan"), who

---

[2] The non-redacted version of Dkt. No 25, which includes exhibits 9 through 14, is filed under seal.

[3] In its initial draft of the Arbitration Protocol, R&Q had proposed an exchange of complete files concerning the policies Utica had issued to Goulds as well as the coverage litigation and settlement of the coverage dispute between Utica and Goulds within ten days following the arbitration organizational meeting. (Dkt. No. 25-2 at 6.) Utica rejected the proposal, which was omitted from the final Arbitration Protocol. (Dkt. No. 25-3 at 3.)

is representing R&Q in the reinsurance dispute with Utica, had paper copies made of the documents on the Turi CD and completed his review of the documents in early to mid-September of 2009. (Dkt. No. 25, Exh. 12 at ¶ 4.) During his review, Finnegan segregated "a handful of documents" that he that believed were or might later become significant to issues in the arbitration. *Id.* at ¶ 5. The documents from the Turi CD included two email chains between Turi and certain of Utica's outside coverage counsel. *Id.*

FFIC had also entered into reinsurance contracts with Utica with respect to policies Utica had issued to Goulds. (Dkt. No. 1 at ¶ 3.) Utica and FFIC were unable to agree on Utica's claims under the FFIC reinsurance contracts. Utica thereafter sued FFIC in this Court for the alleged breach of the reinsurance certificates, breach by FFIC of its duty of utmost good faith and fair dealing to Utica, and declaratory relief arising out of FFIC's failure to pay Utica's reinsurance billings. (No. 6:09-CV-00853, Dkt. No. 32 at ¶¶ 40-53.)[4] On September 23, 2009, FFIC was served with Utica's complaint in the FFIC litigation. (Dkt. 25, Exh 12 at ¶ 6.)

Until recently, FFIC was also represented by Chadbourne in its litigation with Utica.[5] (Dkt. No. 1 at ¶ 9; No. 6:09-CV-00853, Dkt. No. 146.) Finnegan's former partner at Chadbourne, Mary LoPatto ("Lopatto"), who represents FFIC in its reinsurance litigation with Utica (6:09-CV-00853, Dkt. No. 12), asked Finnegan to assist her in handling FFIC's defense, and he readily agreed. (Dkt. No. 25, Exh. 12 at ¶ 6.) Within days of FFIC's receipt of Utica's

---

[4] The Court may take judicial notice of documents filed in other matters to establish the fact of such litigation and related filings. *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

[5] FFIC is now being represented by the law firm of Cozen O'Connor. (No. 6:09-CV-00853, Dkt. No. 145.)

complaint, Finnegan discussed the two email chains he had segregated from the Turi CD given to R&Q, as well as a handful of other documents, with Lopatto and his colleague, Chadbourne attorney, Nancy Monarch ("Monarch"), in connection with their representation of FFIC. *Id.* Utica claims that Finnegan's disclosure to Lopatto and Monarch violated the Arbitration Protocol, or, in the alternative, the October 2008 confidentiality agreement entered into in connection with the audit. (Dkt. No. 26 at 5-6.)[6]

On September 21, 2011, Utica moved for a protective order in the FFIC litigation seeking to claw back six allegedly privileged documents that Utica claimed had been inadvertently included on a CD of Turi emails it had given to FFIC.[7] (6:09-CV-00853, Dkt. No. 83.)  In his affidavit in opposition to Utica's motion for a protective order, Finnegan disclosed that five of the six documents at issue were embedded in the two email chains on the Turi CD given to R&Q that Finnegan had discussed with Lopatto and Monarch. (Dkt. No. 25, Exh. 12 at ¶ 7.)  Finnegan identified the parties to those emails and the dates on which they were sent in his affidavit. *Id.*, Exh. 12 at ¶¶ 5 and 7.  In its memorandum of law in opposition to Utica's motion for a protective order, also filed under seal, FFIC, through the counsel it shared with R&Q, stated that at least four of the emails at issue had also been provided to R&Q. *Id.*, Exh. 13 at 19-20.  The content of the emails was not disclosed in either Finnegan's affidavit or FFIC's memorandum of law.  Utica contends that the mere disclosure of the fact that Utica had given the emails to R&Q,

---

[6] The unredacted version of Utica's Reply Memorandum of Law in Support of Motion for a Preliminary Injunction was filed under seal.

[7] This Court issued a Decision and Order granting Utica's motion for a protective order allowing it to claw back the inadvertently produced documents in the FFIC litigation. (6:09-CV-00853, Dkt. No. 83.)

as well as of the names and dates on the emails, violated the Confidentiality Agreement and Order entered into in the R&Q reinsurance arbitration. (Dkt. No. 26 at 5-6.)

## II.   ANALYSIS

To be entitled to a preliminary injunction in the Second Circuit, a party must demonstrate: "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief."[8] *UBS Financial Services, Inc. v. West Virginia Univ.*, 660 F.3d 643, 648 (2d Cir. 2011) (citation and internal quotations marks omitted). "An award of an injunction is not something a plaintiff is entitled to as a matter of right, but rather it is an equitable remedy issued by a trial court, within the broad bounds of its discretion, after it weighs the potential benefits and harm to be incurred by the parties from the granting or denying of such relief." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 68 (2d Cir. 1999); *see also Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 23 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right."); *Sussman* v. *Crawford*, 488 F.3d 136, 139-40 (2d Cir. 2007) (preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion.") (emphasis in original) (citation and internal quotation marks omitted).

---

[8] It is not necessary for the court to finally decide the merits of the controversy in determining whether a plaintiff has demonstrated a likelihood of success on the merits. "It is necessary only that the court find that the plaintiff has presented a strong prima facie case to justify the discretionary issuance of preliminary relief." *J.P. Morgan Securities Inc. v. Louisiana Citizens Property Ins. Corp.*, 712 F. Supp. 2d 70, 75-76 (S.D.N.Y. 2010) (quoting *Gibson v. U.S. Immigration & Naturalization Serv.*, 541 F. Supp. 131, 137 (S.D.N.Y. 1982)).

A.      **Irreparable Harm**

The Second Circuit has emphasized that "[i]rreparable harm is the single most important prerequisite for the issuance of a preliminary injunction,' and that, accordingly, the moving party must first demonstrate that such injury is likely before the other requirements for issuance of an injunction will be considered." *Grand River Enterprise Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (quoting *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005)) (internal quotation marks omitted); *see also Reuters Ltd. v. United Press Intern., Inc.*, 903 F.2d 904, 907 (2d Cir. 1990) (same). In order to satisfy the irreparable harm requirement, Plaintiff "must demonstrate that absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River*, 481 F.3d at 66 (citation and internal quotation marks omitted); *see also Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) ("To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.") (citation and internal quotation marks omitted).

Utica has failed to meet its burden of demonstrating that it will sustain irreparable harm for which money damages cannot provide adequate compensation absent a preliminary injunction. Plaintiff's opening motion papers were limited to the Ahmad Declaration, the Arbitration Protocol, the Arbitration Confidentiality Agreement entered as an Order in the arbitration, the Stipulated Protective Order filed in the FFIC litigation, and Utica's Memorandum of Law. (Dkt. Nos. 9, 9-1, 9-2, 9-3, 9-4, and 10.) Ahmad stated in his opening Declaration (the

9

only opening declaration/affidavit submitted by Utica) that:

> 8. Goulds, Utica's insured, has been a defendant in tens of thousands of lawsuits alleging asbestos exposure. As Goulds' insurer involved in the defense of the claims, Utica has privileged information about the claims.
>
> 9. Attorney-client and work-product privileged information has been provided to R&Q in its role as reinsurer. This information relates to the claims against Goulds as well as certain coverage disputes between Utica, on the one hand, and Goulds and Goulds' other insurers, on the other hand.
>
> 10. In the California action involving Goulds, Continental Casualty Company brought contribution claims against Utica.

(Dkt. No. 9 at ¶¶ 8-10.) Presumably those statements were intended to support the irreparable harm component of Utica's motion for a preliminary injunction. Those facts constitute the only evidence submitted in support of Utica's claim of irreparable harm. The Ahmad Declaration submitted as a part of Utica's reply papers (the only reply declaration/affidavit submitted by Utica) merely identifies exhibits which go to the issue of R&Q's alleged breach of the various confidentiality agreements and arbitration order. (Dkt. Nos. 25 at 1-2 and 25-1 through 25-5.)[9]

In its Memorandum of Law, Utica argues that R&Q's recognition that "serious injury could result to any party and its business if the other party breaches its obligations under [the] Agreement" in the arbitration Confidentiality Agreement and Order (Dkt. Nos. 9-2 at 2-3 and 9-3 at 2-3) weighs in favor of a finding of irreparable injury. (Dkt. No. 10 at 12.) A contract provision in which a party acknowledges that a breach *will* cause irreparable harm "might

---

[9] Inasmuch as a memorandum of law is not evidence, the Court's evidentiary consideration on the question of irreparable harm is limited to the Ahmad Declarations and Utica's exhibits, as well as relevant evidence submitted by R&Q. *See Giannullo v. City of New York*, 322 F.3d 139, 142 (2d Cir. 2003).

arguably be viewed as an admission that a party will suffer irreparable harm" if the agreement is breached. *Ticor Title,* 173 F.3d at 69. However, even a conclusory contract provision which, unlike the provision relied upon by Utica, concedes that a breach *will* cause irreparable harm (rather than *could* cause serious injury or irreparable harm) cannot alone establish irreparable harm for purposes of a preliminary injunction. *Ardis Health, LLC v. Nankivell,* No. 11 Civ. 5013(NRB), 2011 WL 4965172, at *3, 2011 U.S. Dist. LEXIS 120738, at *10 (S.D.N.Y. Oct. 19, 2011) (Reice Buchwald, D.J.) ("contractual language declaring money damages inadequate in the event of a breach does not control the question whether preliminary injunctive relief is appropriate;" and "the [c]ourt must perform a standard inquiry into the existence of irreparable injury and simply use the contractual provision as one factor in its assessment.") (citing *Baker's Aid, a Division of M. Raubvogel Co. v. Hussmann Foodservice Co.*, 830 F.2d 13, 16 (2d Cir. 1987); *see also Boston Laser, Inc. v. Qinxin Zu,* No. 3:07-CV-0791 (TJM/DEP), 2007 WL 2973663, at *12, 2007 U.S. Dist. LEXIS 78021, at *39-40 (N.D.N.Y. Sept. 21, 2007) (Peebles, M.J.) (although a contract provision conceding that a breach will entitle the non-breaching party to an injunction is "not lacking in significance," it is not alone dispositive on the issue of irreparable harm, and the court "must engage in the usual case-by-case analysis" to determine the issue of irreparable harm).

Even factoring in the contractual acknowledgment that "serious injury could result to a party, as the result of the breach of the confidentiality order in the arbitration," Utica has failed in its burden of proving irreparable harm. "The party seeking injunctive relief bears the burden of proving that it is entitled to such relief, and must do so with evidence, and may not rely on vague claims of potential harm." *Caldwell Mfg. Co. North America, LLC v. Amesbury Group, Inc.*, No.

11

11-CV-6183T, 2011 WL 3555833, at *3, 2011 U.S. Dist. LEXIS 89447, at *9 (W.D.N.Y. Aug. 11, 2011) (Telesca, D.J.); *see also USA Network v. Jones Intercable, Inc*., 704 F. Supp. 488, 491 (S.D.N.Y. 1989) (a preliminary injunction "should not issue upon a plaintiff's imaginative, worst case scenario of the consequences flowing from the defendants' alleged wrong but upon a concrete showing of imminent irreparable harm."). Utica has presented nothing more than conclusory statements that: (1) it has privileged information concerning the asbestos claims being asserted against Goulds; (2) it has given attorney-client and work product privileged information relating to the claims against Goulds and Utica's coverage dispute with Goulds and Goulds' other insurers and (3) Continental Casualty Company brought cross-claims against Utica in the Goulds' coverage litigation.[10] *See New York State Psychiatric Ass'n. v. Blum*, 475 F. Supp. 67, 72 (S.D.N.Y. 1979) (conclusory assertions of irreparable harm without supporting evidence are insufficient for issuance of a preliminary injunction). Conspicuously lacking in the record before the Court are specifics concerning confidential or privileged information and the reasons why disclosure of the information would cause Utica, or any other party, irreparable harm.

The disclosures out of which this lawsuit has arisen offer no support for Utica's claim of irreparable harm. The email chains on the Turi CD, which Finnegan discussed with FFIC counsel Lopatto and Monarch, had been given to FFIC by Utica well before those discussions took place. (Dkt. No. 25, Exh. 12 at ¶¶ 6-7.) Furthermore, the only conceivable harm to Utica as a result of Finnegan's disclosure that the privileged documents at issue in Utica's motion for a

---

[10] At oral argument, Utica's counsel confirmed that its coverage dispute with Goulds has been settled, and that the Continental Casualty cross-claims have been resolved. In addition, Utica's counsel informed the Court that Utica knows from public filings that the Goulds coverage disputes between Continental and FFIC have also been resolved. Counsel was uncertain as to the status of Goulds' coverage dispute with Travelers.

protective order had also been given to R&Q, would be that it placed the Court on notice that Utica's inadvertent disclosure of privileged documents had not been limited to FFIC.  (Dkt. No. 25, Exh. 12 at ¶¶ 4-11; Exh. 13 at 19-20.)

In addition, this Court can take judicial notice of the fact that Utica has not brought to its attention any additional disclosures by R&Q or its counsel of information deemed confidential under the confidentiality agreements and order since Finnegan's discussions with Lopatto and Monarch in September of 2009 and submissions on behalf of FFIC in opposition to Utica's motion for a protective order in the FFIC litigation in October of 2011.  *See Kamerling,* 295 F.3d at 214 (establishment of irreparable harm requires a showing of "continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.") (citation and internal quotation marks omitted).

>    B.    **The Merits**

Utica's failure to demonstrate irreparable harm is alone sufficient to deny its request for a preliminary injunction.  *See Jayaraj v. Scappini*, 66 F.3d 36, 38-39 (2d Cir. 1995) ("Because we hold that [plaintiff] failed to establish that he would suffer irreparable harm in the absence of an injunction, there is no need to reach the second portion of the preliminary injunction analysis."). If the Court were to consider the second portion of the analysis, however, it would likely conclude that Utica has shown a likelihood of success on the merits on its claim that Finnegan's communications with Lopatto and Monarch breached one or more of the confidentiality agreements entered into by the parties.[11]

---

[11] In its opening papers, the only evidence Utica submitted on the merits of its claims was the Arbitration Protocol and the October 2009 Confidentiality Agreement and Order that Utica claims were breached.  (*See generally* Dkt. Nos. 9, 9-1, 9-2, and 9-3.)  Given Utica's paltry

Under New York law,[12] "an action for breach of contract requires proof of (1) a contract;

---

evidentiary showing, there can be no question but that it failed miserably in satisfying its duty to carry the burden of persuasion by a clear showing in those papers. *Sussman*, 488 F.3d at 139-40. Moreover, although Utica alleged the breach of the October 2008 Confidentiality Agreement in its Complaint, it relied solely on claimed breaches of the Arbitration Protocol and October 2009 arbitration Confidentiality Agreement and Order in support of its request for a preliminary injunction. (Dkt. No. 10 at 2-3.) Utica's rationale for failing to submit evidence supporting its claim on the merits in its opening papers is that it could not do so until Judge Lowe signed an order unsealing documents in the FFIC litigation. (Dkt. Nos. 9-5 and 10 at 3.) In its reply papers, submitted after Judge Lowe had executed an unsealing order, Utica did finallt submit some evidence in support of its breach of contract claims. (Dkt. Nos. 25, 25-1, 25-2, 25-3, 25-4, 25-5 and Exhs. 9-14.)

Although courts need not consider evidence and legal arguments first included in reply papers unless they are in response to evidence and arguments in the opposing papers, *see, e.g., Litton Industries, Inc. v. Lehman Bros. Kuhn Loeb Inc.,* 767 F. Supp. 1220, 1235 (S.D.N.Y. 1991), *rev'd on other grounds*, 967 F.2d 742 (2d Cir. 1992), they are not without discretion to do so. *See Cifarelli v. Village of Babylon*, 93 F.3d 47, 53 (2d Cir. 1996) (proper for district court to consider new evidence submitted with defendant's reply where the record showed that the plaintiff "was fully aware prior to defendants' reply of" the issue to which the evidence pertained); *Bayway Refining Co. v. Oxygenated Marketing and Trading A.G.*, 215 F.3d 219, 227 (2d Cir. 2000) (acceptance of new evidence in reply supported by fact that opposing party was not surprised by the evidence, did not ask for permission to file a sur-reply, and did not claim that it had contrary evidence to introduce). The correspondence between counsel for Utica and R&Q submitted by Utica in its reply papers specifically responded to R&Q's opposing argument that there was no breach of the Arbitration Protocol or the arbitration Confidentiality Agreement and Order because the information disclosed was given to R&Q in the ordinary course of business. Moreover, at the time it served its opposition papers, R&Q, through its attorney Finnegan, was well aware of the specifics of the claimed breaches (Dkt. Nos 19 at 6-11 and 25, Exh. 12) and had knowledge that Utica was suing for breach of the October 2008 Confidentiality Agreement even though it was not specifically mentioned by Utica in its opening papers. (Dkt. No. 1 at ¶¶ 38-42). In addition, the record does not reflect any request by R&Q to serve a sur-reply in response to Utica's inclusion of new evidence. Another relevant factor is Utica's inability to submit certain of the new evidence until Judge Lowe issued the unsealing order. (Dkt. No. 25-5.) Taking all of those factors into consideration, the Court has concluded that consideration of the evidence included in Utica's reply papers on this motion is appropriate.

[12] The October 2008 Confidentiality Agreement contains a provision agreeing that New York law will apply. (Dkt. No. 1-1 at ¶ 5.) The Arbitration Protocol and arbitration Confidentiality Agreement and Order do not contain a choice of law provision. (Dkt. Nos. 9-2, 9-3, and 9-4.) However, the arbitration is venued in New York. (Dkt. No. 1 at ¶ 6.)

(2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir. 1994). Since nominal damages are always available for a breach of contract, proof of actual damages is not necessary.[13] *See T & N PLC v. Fred James & Co. of New York, Inc.*, 29 F.3d 57, 60 (2d Cir. 1994); *see also Goldblatt v. Englander Communications, L.L.C.*, No. 06 Civ. 3208(RWS), 2007 WL 148699, at *4, 2007 U.S. Dist. LEXIS 4278, at *12 (S.D.N.Y. Jan. 22, 2007) (Sweet, J.) (whenever there is a breach of contract, the law infers some damage) (citing *Finley v. Atlantic Transp. Co., Ltd.*, 220 N.Y. 249 (1917)).

Utica claims that the Turi CD was given to R&Q in connection with the arbitration proceedings, and that Finnegan's communications with Lopatto and Monarch therefore breached the confidentiality provision in the Arbitration Protocol and the arbitration Confidentiality Agreement and Order.[14] (Dkt. No. 26 at 3.) R&Q, on the other hand, contends that the contents

---

[13] Utica has also asserted a claim for tortious interference with contract in its Complaint. (Dkt. No. 1 at ¶¶ 52-56.) The elements of a claim for tortious interference with contract are the existence of a valid contract between the plaintiff and a third party; defendant's knowledge of the contract; intentional procurement of the third-party's breach of the contract by defendant without justification; a breach of the contract. *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401-02 (2d Cir. 2006). Given that Utica had already sued FFIC for breach of contract at the time the alleged confidentiality breaches by R&Q occurred (Dkt. No. 25, Exh. 12 at ¶ 6), it is unlikely that Utica will be able to prove that R&Q intentionally procured FFIC's breach. Furthermore, unlike a breach of contract claim for which nominal damages are always available, actual damages are required to establish a claims for tortious interference with contract. *See Kronos, Inc. v. AVX Corp.*, 595 N.Y.S.2d 931 (1993).

[14] Finnegan contends that his admitted disclosure to Lopatto and Monarch took place prior to the execution of the arbitration October 2009 Confidentiality Agreement and Order. Unless it is established that the disclosure took place when the Agreement and Order were in effect, it seems unlikely that Utica will be able to establish a breach even if it is ultimately determined that the Turi CD was produced "in the [arbitration] proceedings." (Dkt. No. 9-3 at ¶ 2.)

15

of the Turi CD are not confidential because the CD was given to it by Utica "in the ordinary course of business, in response to questions raised by R&Q following R&Q's receipt of reinsurance billings from Utica." (Dkt. No. 19 at 6.)

One thing that is abundantly clear from the record before the Court on Utica's motion is that Utica and R&Q's dealings concerning Utica's reinsurance claims, including the dispute that led to the arbitration and the arbitration itself, were thoroughly blanketed with confidentiality agreements and orders. (Dkt. Nos. 1-1, 9-19-2, and 9-3.) There is no discernable gap in the confidentiality obligations under the various agreements and order that would have allowed Finnegan to discuss freely documents on the Turi CD with Lopatto and Monarch at any point after October 2008 when the Confidentiality Agreement was entered into in connection with the audit. Further, in a January 14, 2009 letter from Finnegan to Andrews, sent as a part of the negotiation of the Arbitration Protocol, Finnegan appears to refer to the production of documents for the reinsurance audit conducted by R&Q as having been made "in the ordinary course of business." R&Q's use of that term in its opposition papers to describe the circumstances of the production of the Turi CD in R&Q lends support to the conclusion that if the disclosure made to Lopatto and Monarch was not covered under Arbitration Protocol or the arbitration Confidentiality Agreement and Order, it was covered under the October 2008 Confidentiality Agreement entered into in connection with the audit. (Dkt. No. 25-3 at 2, ¶ 3.)

If the Turi CD is ultimately found to have been produced as a part of the audit, albeit belatedly, there is a likelihood that Utica will be successful in establishing a claim that R&Q

16

breached the October 2008 Confidentiality Agreement.[15]  On other hand, if the Turi CD is found to have been produced in the arbitration, even though the arbitration proceedings had yet to begin, there is a likelihood that R&Q counsel Finnegan's disclosure will be found to have breached the Arbitration Protocol, which was in effect at the time of the disclosure.[16]

### III. CONCLUSION

Since no degree of likely success on the merits can compensate for Utica's failure to demonstrate that "absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent," *Grand River*, 481 F.3d at 66, the Court hereby

**RECOMMENDS**, that Plaintiff's motion for a preliminary injunction (Dkt. No. 8) be **DENIED.**

Dated: November 6, 2012
Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[15]  The same would most likely hold true for R&Q's disclosure of the names of the parties and dates of the emails at issue in Utica's motion for a protective order, albeit not for the disclosure of the fact that the emails had also been given to R&Q by Utica.

[16]  If the Turi CD is ultimately found to have been produced in the arbitration, Utica may be successful in showing a breach of the arbitration Confidentiality Agreement and Order with respect to both disclosure of the production of the privileged documents to R&Q as well as the information concerning the emails in the papers submitted by FFIC in opposition to Utica's motion for a protective order.